**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JOHN DOE,** | Case No.: |
| Plaintiff, | **Civil Complaint and Jury Demand** |
| vs. | |
| **BARRIE DREWITT-BARLOW,** | |
| Defendant. | |

Plaintiff, John Doe,[1] by and through his attorneys, The Fierberg National Law Group,

PLLC, and Laura E. Laughlin of the law firm Laura Laughlin Law, PLLC, bring this action

against Defendant Barrie Drewitt-Barlow ("Barrie") and hereby alleges as follows:

## INTRODUCTION

1.       In 2013, Barrie initiated, was involved in, and carried out a scheme to groom,

recruit, and exploit John, then a 15-year-old boy living with his mother in Wales, with few

educational and career opportunities.  Barrie was a high-profile, successful businessman, and he

targeted and enticed John, a distant relative, by promising to employ him, make him part of his

immediate family, and forever change the trajectory of his life in ways John could never have

imagined. Upon turning 16 years old, John accepted Barrie's promises and invitation, quit his

studies, boarded a train to move away from his mother, was picked up on the other side of the

United Kingdom by Barrie's chauffeured limousine, and taken to his mansion. Mere hours after

establishing physical custody over John, John was directed to shower in Barrie's personal

bathroom. When John came out of the shower, he was sexually assaulted by Barrie for the first

of many times. John was then directed to the bedroom he would share with Barrie's children.

---

[1] Plaintiff is proceeding under a fictitious name pursuant to subsection (f)(1) of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1. Counsel for Plaintiff will apprise Counsel for Defendant of Plaintiff's identity.

Within a day or so later, Barrie purchased John an entirely new wardrobe, took him to have his eyebrows trimmed, and paid for John to receive a full-body spray tan. John started employment with Barrie's company, which operated from offices in the U.K. Over the following years, John remained entirely dependent upon Barrie and his family for food, shelter, income, and in all other material ways, and he was subjected to relentless sexual abuse, sexual exploitation, and sex trafficking in several countries and U.S. states.

2.      Around the age of 17, Barrie moved John to the family's home in New Jersey and employed John at his company's Princeton office. John did not then or ever have a permit to work in the U.S. When travelling to the U.S., Barrie held John's passport and instructed John to lie to U.S. immigration officers about the purpose of his visit. At the time, John was a minor, marginally educated, with *no* employment history qualifying him for skilled work. For the next few years, John remained dependent upon and continued to live with Barrie and his family, travelled with them across the United States and even the world, including in New Jersey, New York, Florida, and Nevada, and was continually sexually assaulted by Barrie. John also believes and, thus, alleges, that Barrie took photographs and videos of him – openly and vis-à-vis security cameras – that depict John naked, being sexually assaulted by individuals at the direction or approval of Barrie, being subjected to child sexual abuse, and in other ways that constitute prohibited Child Sexual Abuse Material ("CSAM"). John also believes and thus alleges that Defendant Barrie administered substances to John that altered and disabled his consciousness and facilitated Barrie's sexual abuse of him, in addition to Barrie's regular provision of alcoholic substances to him when he was under legal drinking age to accomplish the same. On many occasions, John woke up in the morning with cloudy memories of being sexually abused, with a lack of awareness of how he got to the location where he awoke or why his penis was bleeding.

3.      Barrie also subjected John to threats of physical harm, warning John numerous times that "You don't mess with me." On multiple occasions, John witnessed Barrie engaging in physical violence and abusive verbal confrontations with others who raised his ire.

4.      As John grew older, he made multiple attempts to seek independence and remove himself from Barrie's control. He was punished each time, warned that he was being monitored, and shown video evidence confirming the same. In one such incident, Barrie punished John after he developed a heterosexual relationship with a young woman by stranding him, penniless, at a motel near an airport in Florida at 7:00 a.m., knowing that the flight taking him back to his mother's home in the U.K. was not departing until the following evening.

5.      For years after managing to escape Barrie's control, John, as a direct and proximate result of Defendant's egregious misconduct as alleged herein, descended into isolation, substance abuse, unemployment, and suffered, and continues to suffer, from extreme emotional distress, including post-traumatic stress disorder. John's physical, emotional, and monetary injuries and damages are likely to persist throughout the balance of his life.

6.      On or about May 5, 2026, Barrie and another adult male were arrested by police in the U.K. on suspicion of human trafficking, sexual exploitation, and rape, and subsequently held in custody and formally charged with such offenses. John reasonably believes, and thus alleges, that such arrests and charges directly result from or are otherwise related to the abuse he and others endured. On or about May 23, 2026, two more individuals were arrested in the U.K. and held by police on similar charges. John also reasonably believes, and thus alleges, that the facts underlying such arrests and charges have been supported by statements given to police and investigators by him, other survivors of sexual abuse, and independent third-party witnesses, whose identities are presently unknown to John.

3

7.      John seeks justice against Barrie and brings claims of sex trafficking in violation of the Trafficking Victim Protection Reauthorization Act ("TVPRA") and N.J.S.A. 2C:13-8, *et seq.*; sexual abuse of a child in violation of N.J.S.A. 2A:61B-l; sexual assault and battery; intentional infliction of emotional distress; and negligence. Defendant Barrie's actions also constitute actual malice or a wanton and willful disregard of persons who foreseeably might be harmed by his wrongful behavior. Thus, John also seeks punitive damages.

8.      In this action, John seeks all compensatory and punitive damages, attorneys' fees, and costs in an amount of no less than $25,000,000, or in such other or higher amount as a jury may in its discretion award, and all other and further relief allowable under law and as this Court deems just and proper.

## THE PARTIES

9.      Plaintiff John was a minor child when Barrie invited him to live with his family and transported him to multiple U.S. states, including Barrie's home in New Jersey, where he was sex trafficked and sexually abused. Defendant Barrie also employed John at his company located in Essex, United Kingdom and in Princeton, New Jersey. Plaintiff presently resides in the United Kingdom. Plaintiff is proceeding under a fictitious name pursuant to subsection (f)(1) of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1.

10.      At all times material, Defendant Barrie was the Chief Operating Officer (COO) of his companies, maintained a family residence in New Jersey that included John, and directed, perpetrated, and substantially supported and assisted in the wrongful acts as alleged herein within this judicial district and elsewhere. Upon information and belief, Defendant Barrie is presently domiciled in the United Kingdom and is otherwise being held in custody by law enforcement.

## JURISDICTION AND VENUE

4

11.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

12.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's claims under the TVPRA in that they form part of the same case or controversy under Article III of the United States Constitution.

13.    This Court has personal jurisdiction over Barrie pursuant to New Jersey's long-arm statute and the Due Process Clause of the Fourteenth Amendment because Barrie purposefully directed his activities toward New Jersey and this action arises out of and relates to those activities.

14.    Barrie repeatedly and intentionally transported John to New Jersey and sexually abused him there in connection with his personal and business activities in New Jersey. A substantial part of the events and omissions that gave rise to John's claims—including the sexual abuse, trafficking, and related misconduct—occurred, were planned, and supported in New Jersey, and exercised personal jurisdiction over Barrie in this action, which comports with traditional notions of fair play and substantial justice.

15.    In addition, by maintaining an ongoing business presence and family home in New Jersey and engaging in the misconduct alleged herein while present in this State, Barrie has purposefully availed himself of the privilege of conducting activities within New Jersey and could reasonably anticipate being hauled into court here.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## **FACTUAL ALLEGATIONS**

17.    In 2012-2013, when John was a vulnerable 15-year-old, Defendant Barrie embarked on a coordinated effort to recruit and entice him into his household, deliberately bypassing John's mother to communicate with John directly. Through these conversations, Barrie learned of John's personal circumstances, including that a single parent was raising him in a financially unstable home. Barrie was a widely known, purportedly successful businessman and media personality. Barrie promised a life John could only imagine should he come to live with Barrie and his family - a life that would include Barrie's support and guidance, a career, and potential life-changing achievements.

18.    John placed his trust in Barrie. Barrie's familial connection to John's family created an automatic sense of security and trust in John's mind. Upon information and belief, Barrie knew that his familial relationship, wealth, and notoriety would circumvent any questioning by John's family about the propriety of his connections with John and subsequent requests to have him live and gain employment under his care and supervision.

19.    Defendant Barrie used his family relationship, promises of an affluent lifestyle and employment opportunities, and John's young age as tools to groom and gain John's trust. Knowing Barrie's public profile and celebrity status in the United Kingdom, John became deeply captivated with the idea of meeting Barrie and his family and altering the existing status and trajectory of his life. John quit his studies and decided to leave home to benefit from the new, near-fantasy life promised by Barrie. During these exchanges, Barrie learned John was just 15 years old. John was asked to send personal photographs and images of himself.

20.    Barrie solicited, participated in, arranged, and paid for John to travel from his home to Barrie's home in Essex, United Kingdom, in April 2013, right after he turned 16 – an age Barrie waited for him to attain before bringing John to his family home. Upon information

6

and belief, Barrie waited until this time based upon his belief that boys who reach the age of 16 can legally consent to engage in sex.

21.     Under Section 16 of the U.K.'s Sexual Offences Act 2003, it is unlawful to engage in sexual activity with a child under the age of 18 if a person is in a position of trust with the child. Section 16 recognizes the inherent imbalance of power in such relationships and outlaws the sexual exploitation of a minor in such circumstances.

22.     Barrie arranged for his family's personal driver to meet John's train. John was picked up from London Paddington station – giving him the first of many evident displays of the affluent lifestyle promised to John in prior communications with Barrie and confirmed by his web-based research.

23.     After John was driven to Barrie's company's office located in Maldon, U.K., Barrie began integrating John into his immediate family and daily routine. Barrie brought John to pick up Barrie's children from school. Barrie brought John to his lavishly decorated home, completing his wide-eyed, naïve introduction to Barrie's world.

24.     The sexual abuse started later that day. Within hours of John's arrival at his family home, John was directed to use Barrie's personal bathroom for a shower. When John finished showering, Barrie sexually assaulted John. It was the first of many times that John was sexually assaulted by Barrie.

25.     John, far from his family and any support, feared for his life and the safety of his family. John was now dependent on Barrie for his every need. This sexual abuse continued day after day, including by Barrie and others. The sexual abuse occurred when, where, with whom, and how Barrie instructed, approved, materially supported, or arranged - virtually daily and frequently multiple times per day, and in multiple countries and U.S. States.

7

26.    Barrie also engaged in sex acts with John's brother, asking John to leave while Barrie "finished" with his brother. Then, and on many occasions before and after John moved to the United States, John would wake up in the morning with cloudy memories of the prior evening's activities, how he ended up in the place where he awoke, and how he sustained injuries to his penis. Barrie regularly supplied John with intoxicating drinks and, upon information and belief, drugs that disabled him physically and mentally and were administered to facilitate wrongful sex acts.

27.    Beginning in early 2015, when John was a 17-year-old minor child, Barrie took John on multiple trips to the United States, including trips to New Jersey. The travel was frequent, and Barrie represented to John that he would eventually move to the U.S. full-time and work for Barrie's company, even though he never held a work visa or any lawful status permitting employment. At such times, John was a marginally educated boy with no employment history, yet he was fascinated by Barrie's promises to employ him at his company.

28.    During these trips, Barrie maintained control over John's passport. Knowing that John lacked a work visa, Barrie advised John to lie to immigration officials by denying any employment responsibilities if questioned. Barrie also directed John to tell anyone who asked that he was his "uncle." Barrie often lied to immigration and customs personnel to gain John's entry into the U.S.

29.    In 2017, after experiencing four years of sexual abuse by Barrie or under his direction and facilitation, John attempted to free himself from Barrie's control and sexual servitude. John told Barrie that he wanted to travel back to the U.K. because he was worried he would never see his family again. Unhappy that John was resisting his control, Barrie threatened John with physical harm if he ever divulged the truth about the sexual demands and

8

transgressions, advising him that he was not to speak with people outside Barrie's family's "bubble."

30. These threats were very real and frightening to John after spending years under Barrie's tight control. John was deeply afraid of Barrie, having endured numerous outbursts of his anger and having witnessed Barrie assault another man, resulting in a bloody nose. Barrie told John numerous times over the years that "You don't mess with me."

31. With no stable home environment, educational degrees, career opportunities, money, or safety net, John returned to Barrie's home in New Jersey in 2018. Barrie once again required John to submit to his control and directed him to move into the family's home on Bayshore Boulevard in Tampa, Florida.

32. There, as with his other homes, Barrie tracked John's actions via surveillance cameras and confronted him harshly if his actions reflected any perceived disloyalty or transgression. This time together was short-lived because Barrie learned about John's interest in heterosexual relationships and was displeased. John was sent back to the U.K.

33. In 2019, John returned to Barrie's home in New Jersey to obtain the benefits and promises made about advancing personally and professionally. John was under Barrie's direct control and servitude. Barrie created multiple highly sexualized circumstances and demands on John, involving heavy drinking, smoking, likely drug use (e.g., administered without John's knowledge and consent), and sex acts with Barrie and others that were often recorded. Barrie directed John to penetrate another man's anus with his penis, and then forcefully and similarly penetrated John as an act of dominance.

34. During the last "encounter" between Barrie and John, Barrie took nude photos of John and posted them on social media without his consent, causing further embarrassment and

harm. Some of the photos taken remained on Barrie's social media well into 2026. While John was of age in this photo, it was posted without his consent, and numerous other photos and videos Barrie took of John remain in Barrie's possession and likely constitute child sex abuse material under U.S. and U.K. law.

35. John again attempted to gain independence. Barrie punished him by stranding him without money at a local motel more than a day before his flight back to the U.K.

36. As a direct and proximate result of Barrie's actions as alleged herein, John has suffered, and will undoubtedly continue to suffer, significant physical and emotional trauma, which is recoverable under United States law. He is in active treatment for his injuries, having engaged in self-harm and self-medication for many years, and such harm, depression and injuries adversely impacted virtually every aspect of his life. John never graduated from school, is isolated from friends and community, and has been unable to maintain any consistent or meaningful employment.

37. Barrie's sexual abuse of John – beginning in childhood, perpetrated in countless deviant ways, and continuing for years – has caused him pain, PTSD, mental suffering, diminished his childhood and enjoyment of life, and will undoubtedly harm him throughout the balance of his life, personally and professionally.

## COUNT I
### Child Sex Trafficking in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595

38. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

39. Defendant perpetrated sex trafficking of John when he was a minor child by knowingly, and through interstate and foreign commerce, recruiting, enticing, harboring,

providing, obtaining, maintaining, and/or soliciting John, and causing him to travel between the United Kingdom and New Jersey, with the purpose that he engage in commercial sex acts.

40.    A "commercial sex act" is defined under the TVPRA as "any sex act, on account of which anything of value is given to or received by any person." *Id*. § 1591(e)(3).

41.    Defendant caused John to engage in commercial sex acts when he was a minor child by demanding and obtaining sex from John in exchange for housing, gifts, including clothing and salon services, international travel, financial support, and promises of continued employment and career advancement with his company, all of which constitute "things of value" under the TVPRA.

42.    At all relevant times, John had not attained the age of 18 years, and Defendant knew that John was a minor.

43.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the TVPRA, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT II
**Sex Trafficking Violation of Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595**

44.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

45.    John is a victim of sex trafficking under 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

46.    Defendant perpetrated sex trafficking of John by knowingly, and through interstate and foreign commerce, recruiting, enticing, harboring, providing, obtaining,

maintaining, and/or soliciting John by demanding sex in exchange for housing in Defendant's lavish homes, gifts including clothing and salon services, meals, compensation, trips to the United States and other countries, and promises of continued employment with his company.

47.    A "commercial sex act" is defined under the TVPRA as "any sex act, on account of which anything of value is given to or received by any person." *Id*. § 1591(e)(3).

48.    Once John reached the age of 18, Defendant used force, fraud, and/or coercion for the purpose of causing Plaintiff to engage in a commercial sex act, including through exploiting familial ties and a custodial relationship; providing intoxicating drinks and, upon information and belief, drugs that impaired his ability to resist; and threatening John with physical harm if he disclosed Defendant's conduct or tried to leave Defendant's control.

49.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the TVPRA, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT III
### Financially Benefitting from Trafficking in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1593(A)

50.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

51.    John is a victim of sex trafficking under 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

52.    A "commercial sex act" is defined under the TVPRA as "any sex act, on account of which anything of value is given to or received by any person." *Id*. § 1591(e)(3).

53.     Defendant participated in the recruiting, transportation, harboring, and provision of John for the purposes of engaging in commercial sex acts with himself and others and did so knowing that John was a victim of such sex trafficking.

54.     Defendant authorized and arranged for the "employment" of a minor child with no work visa, lawful status permitting employment, and no employment history as a "Receptionist" and later as a "Recruitment Manager" at a company providing professional services to various, often regulated industries; issued paychecks to John; brought John to live with and work for him while he was a minor; and sexually abused John while standing *in loco parentis* to him when he was a minor in their care.

55.     Defendant has financially benefited as a result of these acts and/or omissions, including through but not limited to: reduced labor costs related to John's work with Defendant's company; direct sexual gratification to Defendant; and power and control over John and his movements - all of which are "things of value" pursuant to the TVPRA.

56.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the TVPRA, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

**COUNT IV**
**Sex Trafficking in Violation of N.J.S.A. 2C:13-8, *et seq*.**

57.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

58.     John is a victim of sex trafficking within the meaning of N.J.S.A. 2C:13-8 and/or N.J.S.A. 2C:13-9 and is therefore entitled to bring a civil action under N.J.S.A. 2C:13-8.1.

59.     Defendant knowingly recruited, lured, enticed, harbored, and transported John to engage in sexual activity when he was a child under age 18 in violation of N.J.S.A. 2C:13-8(1)(3).

60.     Additionally, Defendant also knowingly recruited, lured, enticed, harbored, and transported John to engage in sexual activity through the use of fraud, deceit, and/or misrepresentation in violation of N.J.S.A. 2C:13-8(1)(1)(f); and/or through causing or threatening to cause serious bodily harm to John in violation of N.J.S.A. 2C:13-8(1)(1)(a); and/or through concealing, removing, confiscating, or possessing John's passport in violation of N.J.S.A. 2C:13-8(1)(1)(d).

61.     Additionally, Defendant knowingly received financial value from his participation as a Chief Operating Officer, organizer, supervisor, financier, or manager in a scheme or course of conduct that violated N.J.S.A. 2C:13-8(1)(1).

62.     Defendant's actions were accompanied by a wanton and willful disregard of John, a minor child who foreseeably might be harmed by Defendant's actions in violation of N.J.S.A. 2C:13-8, et seq., entitling John to punitive damages pursuant to N.J.S.A. 2A:15-5.12(a).

63.     As a direct and proximate result of the conduct described above, Plaintiff has suffered and continues to suffer physical and emotional damages, including pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, medical costs, and lost wages.

## Count V
## Child Sex Abuse in Violation of N.J.S.A. § 2A:61B-1 et seq.

64.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

65.     Under the New Jersey Child Sex Abuse Act, "'Sexual abuse' means an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult. A parent, resource family parent, guardian or other person standing *in loco parentis* within the household who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse…" N.J.S.A. 2A:61B-1(1) (emphasis added).

66.     Defendant committed "sexual abuse" against John as defined by the New Jersey Child Sex Abuse Act by engaging in acts of sexual contact with John, who was a minor child, including in New Jersey.

67.     Defendant perpetrated numerous acts of sexual contact against John when he was a minor child, including repeatedly sexually abusing John in New Jersey for three weeks when he was 17 years old.

68.     Additionally, Defendant stood *in loco parentis* to John, beginning in 2013 when John moved into his household and became a minor child in his care. John lived with Defendant, was employed by Defendant, traveled out of his home country with Defendant, and was integrated into the daily life of Defendant and his children. John slept with Defendant's children in their bedroom. Defendant, standing *in loco parentis*, knowingly permitted and/or acquiesced in the sexual abuse of John when John was a minor child.

69.     Defendant's actions were accompanied by a wanton and willful disregard of John, a minor child who foreseeably might be harmed by Defendant's actions in violation of N.J.S.A. § 2A:61B-1 et seq., entitling John to punitive damages pursuant to N.J.S.A. 2A:15-5.12(a).

70.     As a direct and proximate result of the conduct described above, Plaintiff has suffered and continues to suffer physical and emotional damages including pain and suffering,

15

medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, medical costs, and lost wages.

## COUNT VI
### Sexual Assault/Battery (New Jersey)

71.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

72.    Between 2013 and 2018, Barrie inflicted offensive and harmful sexual touching of John, beginning when Plaintiff was a minor child, in New Jersey and other jurisdictions. Defendant's actions would be offensive to a person with a reasonable sense of personal dignity.

73.    John did not consent to the offensive sexual assault and battery, and as a minor child in Defendant's custody and control, John lacked the requisite capacity to consent.

74.    Defendant's actions were accompanied by a wanton and willful disregard of John, a minor child who foreseeably might be harmed by Defendant's actions, entitling John to punitive damages pursuant to N.J.S.A. 2A:15-5.12(a).

75.    As a direct and proximate result of the conduct described herein, John has suffered and continues to suffer physical and emotional damages, including pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, medical costs, and lost wages.

## COUNT VII
### Intentional Infliction of Emotional Distress (New Jersey)

76.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

77.    Defendant engaged in repeated sexual contact with John beginning when John was a minor. Defendant subjected him to daily abuse, including sexual assault, routine

surveillance, threats to his physical safety, isolation from family, and the exertion of extreme control over John's day-to-day life and freedom of movement. These acts constitute intentional conduct so outrageous and extreme as to go beyond all possible bounds of decency, and to be utterly intolerable in a civilized society.

78. Defendant acted intentionally or recklessly and knew or should have known that their sexual abuse, isolation, and control of Plaintiff when he was a minor child would result in extreme emotional distress to Plaintiff beyond what a normal person could be expected to endure.

79. Defendant's actions were accompanied by a wanton and willful disregard of John, a minor child who foreseeably might be harmed by Defendant's actions, entitling John to punitive damages pursuant to N.J.S.A. 2A:15-5.12(a).

80. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer physical and emotional damages, including pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, medical costs, and lost wages.

**COUNT VIII**
**Negligence/Gross Negligence (New Jersey)**

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

82. At all material times, Defendant stood *in loco parentis* to Plaintiff while Plaintiff was a minor in his care and owed a duty to Plaintiff to use reasonable care to ensure the safety of Plaintiff.

83. At all material times, Defendant knew or should have known that John was a victim of sex trafficking and sexual abuse. In addition to sexually abusing Plaintiff, Defendant

17

instructed or encouraged others to engage in sex acts with John, witnessed others sexually abusing Plaintiff, and did nothing to stop the abuse.

84.    Defendant breached this duty of care and was negligent by failing to protect Plaintiff from sex trafficking and sexual abuse that Defendant knew or should have known was occurring.

85.    Despite Defendant's knowledge regarding the sexual exploitation of John, Defendant failed to take any remedial action, report the sexual abuse of John to authorities, or take any action to ensure the health and safety of John.

86.    Because Defendant repeatedly failed to stop the ongoing sexual abuse of John when standing *in loco parentis* to him, Defendant's conduct constituted not only negligence but gross negligence, reflecting a reckless and conscious disregard for Plaintiff's safety and well-being.

87.    As a direct and proximate result of Defendant's negligence, John was repeatedly sex trafficked and sexually abused as a minor and has suffered and continues to suffer physical and emotional damages, including pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, medical costs, and lost wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Award Plaintiff compensatory damages for all of his physical and mental pain, anguish, and severe emotional distress, cost for past and future health care, past and future lost income, and other monetary damages in an amount of no less than $25,000,000.00, and all such other and further damages and relief as may be determined by a jury at trial;

B.    Award Plaintiff punitive damages for Defendant's willful and wanton conduct in

an amount of no less than $25,000,000.00, or such other or greater amount as determined by a jury at trial;

  C.  Award Plaintiff all attorneys' fees, costs, and expenses available under law; and

  D.  Award Plaintiff such additional and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

  Plaintiff demands a trial by jury on all issues triable of right by jury.

        Respectfully submitted,

Dated: July 9, 2026      By: /s/ Laura E. Laughlin
           Laura E. Laughlin
           NJ# 02822-2011
           **Laura Laughlin Law, PLLC**
           1635 Market St., Suite 1507
           Philadelphia, PA 19103
           Tel: (215) 383-8177
           laura@justiceafterharm.com

           Douglas E. Fierberg*
           Jacob R. Goodman*
           **The Fierberg National Law Group, PLLC**
           201 East 17th Street, Suite A
           Traverse City, Michigan 49684
           Tel: (231) 933-0180
           Fax: (231) 252-8100
           dfierberg@tfnlgroup.com
           jgoodman@tfnlgroup.com
           *Pro hac vice* motions to be filed

           Olympias Iliana Konidaris*
           305 Broadway Ave, Seventh Floor
           New York, New York 10007
           Tel: (347) 504-0220
           Fax: (231) 252-8100
           ikonidaris@tfnlgroup.com
           *Pro hac vice* motion to be filed

           *Attorneys for Plaintiffs*